### Illinois Central Railroad Company v. Albert J. Schenk and Charles Heath, partners as Schenk & Heath.

1. QUESTIONS OF FACT—*Verdict Conclusive.*—In an action against a railroad company for setting fire to a building, the question as to where and from what source the fire originated, is one of fact for the determination of the jury.

2. PARTIES—*Interest in Goods Destroyed by Fire.*—Where a person holds goods on commission at his own risk, and is bound by his contract to return them in good order to his principal, or their equivalent in value, his interest in such goods is sufficient to entitle him to recover for their wrongful destruction or damage.

**Trespass on the Case**, for setting fires, etc. Appeal from the Circuit Court of Champaign County; the Hon. FRANCIS M. WRIGHT, Judge, presiding. Heard in this court at the May term, 1895. Affirmed. Opinion filed January 11, 1896.

WOLFE & SAVAGE, attorneys for appellant.

THOMAS J. SMITH and HARRY L. KELLY, attorneys for appellees.

MR. JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

The judgment below was for plaintiffs there, appellees here, for $4,000, for loss on buildings and contents by fire, alleged to have come from an engine of appellant through neglect to provide proper means for its prevention, or carelessness of its employes in handling said engine. The record is brought here by appeal for little reason assigned other than that the verdict was not supported by the evidence.

Appellees were dealers in agricultural implements, wagons, buggies, etc., at the village of Fisher, and carried on their business in four store rooms, fronting south on an east and west street, at the northeast corner, made by its intersection with another on the west running north and south. These rooms were side by side, constituting the main buildings. Joined to the rear or north end of the west building was a shed roof, sloping north and covering a room about seven feet high at the eaves, twenty feet long and twelve in width.

The railroad track running east and west through the village, at its nearest point was about seventy feet north of the shed. The station was about northwest from it. A light passenger train going east arrived at 4:50 o'clock P. M.

of July 4, 1894, the engine stopping a little west or north from the shed. It left at 5:00, and a few minutes thereafter the alarm was given and the usual efforts made to extinguish the fire and remove the stock. According to the evidence the buildings, which were entirely destroyed, were reasonably worth $1,000, and the loss on the stock by destruction and damage $3,951.50

The principal question of fact made was whether the fire was communicated by sparks from the engine—which included, circumstantially, the condition of the appliance for arresting them, and the management of the engine.

No witness pretended to have seen just how, when or where it started. The main rooms were separate, one story, frame buildings, which were either weather boarded or battened without, and tightly lined with strips of tin within, so that when closed, if there was no fire within, it was hardly possible for any to get in without burning its way. The shed room also was so battened and lined. It was a midsummer day. No fire was required in them for any purpose. It was a holiday and they were not opened for business. Appellant Schenk was in there for fifteen or twenty minutes about seven o'clock in the morning, and again in the office for ten minutes, about eight o'clock. Perhaps also they were open about one o'clock P. M., for not more than ten minutes, though the testimony is not clear on that point. But at least for four hours next before the fire they were unopened. It does not appear that they were exposed to any fire from without, unless from the engine. It stood a little west of north from the shed room when the train pulled out. A rather strong wind was blowing in the direction from it to the shed room, whose old shingled roof sloped toward it.

A farmer in the neighborhood, standing from twenty to thirty feet south of the engine, testified that when it started up the wheels slipped on the rails and sparks and balls of fire were thrown out, and continued to be thrown out from the smoke stack until it passed a warehouse east and a little north of appellees' buildings. After the train went out

he started up town and when he got about opposite the depot—two or three minutes after he started—heard the alarm, turned and ran back and saw fire near the center of the shed roof. This was about five minutes after the engine had passed, and in fifteen the roof was all ablaze.

Another witness, who resided in Fisher, north of the depot, was going toward it and was about two hundred feet from it when the train started up. He remarked that they were pulling out rather lively; saw the engine; did not notice the wheels, but did notice that it was exhausting freely, as though it was pulled open to pull out lively, and that as near as he could judge, the throttle was thrown open; it was going exceedingly fast. He paid no particular attention to the train after it started up, but it seemed to him to pull out rapidly past appellees' buildings. Some twenty minutes later he heard the alarm and ran down to them and saw fire in only one place on the shed roof, but it spread rapidly right across the west building.

A third witness, who lived directly south and across the street from the burned warehouses, says he heard the train pull out and was annoyed more than usual by it.

The engine was what is called "a Weldon, old style," with a diamond stack, which a witness formerly employed by appellant as a wiper and hostler in the yards at Champaign, testified was a kind not now in general use nor a good kind to prevent or arrest sparks, for reasons stated, but he had no knowledge of its condition or how it was handled when the train pulled out on the occasion in question. He saw it arrive but did not see it leave.

On the other hand Mr. Jones, employed by appellant at its Rantoul repair shops to examine engines, boilers and smoke stacks, testified that he inspected this one on the day before the fire and again on the day after it, and found the engine and appliances " first class, everything all right;" that he knew of none better than those he described, or in more common use on the road, except as to the main line, about which he had no knowledge in this respect. On cross-examination he admitted it was not proper to throw open the throttle

to start an engine, and that if in good condition fire can not escape; if fire does escape it is not in good condition.

The engineer said he did not see that his engine threw fire when starting out of Fisher, and that the wheels did not slip; that the next station east was Dewey, distant three and a quarter miles from Fisher, and they had twenty-five minutes in which to make the run; that they started on time, at five o'clock, and at a speed of three or three and a half miles an hour. He thought the engine and its appliances were of a good kind and in good condition; had run it since November, 1893, and never known it to throw out sparks, though it might have done so without his knowing it; if it threw out sparks on that day it would have to be slipping on the rails, and if it was so moved out as to slip the wheels it was not properly managed. He had had no experience with a straight stack, and therefore, as to the comparative merits of that and the diamond, expressed no opinion, though he thought the diamond was as much used on the road as the straight.

The fireman corroborated him as to the distance to Dewey, the time card and the rate of speed at which they started from Fisher, but whether sparks were in fact thrown or the wheels slipped before starting or afterward, said nothing.

A locomotive engineer bearing the same surname with that of the one in charge of this engine, but then in the employ of the C., C., C. & St. L. R. R. Co., was of opinion that the diamond stack is as good as the straight for arresting sparks, described the process of treating sparks by each, and stated as a fact that on the C. & A. railroad the diamond was used recently.

Appellant's contention was that the fire in this case originated within and on the floor of the shed room, and some half dozen witnesses testified that there was where they first observed it and that they did not then observe any sign of it elsewhere; while twice as many swore they first observed it on the roof of the shed room and did not then see any sign of it elsewhere. The time, place and position at and from which they so respectively observed it were, of course, different;

but these differences being considered, in connection with the other circumstances in proof mentioned, we think it clear that where and from what source it started were pure questions of fact for the determination of the jury, and their finding upon these questions was supported by a preponderance, of the evidence; and in that case are further of opinion that it was chargeable to the negligence of appellant, if not in respect to the provision of the means of preventing it, in that of its agents in the use of these means.

It is not questioned that damage was done to the full amount found. It appears, however, that a portion of the stock was held under a commission contract, and it is therefore claimed that appellees could not rightfully recover for that. The contract was understood to have been burned in the fire, but the proof was that the goods were at the risk of appellees, who were bound to return them in good order or their equivalent in value, and were not bound to insure them. After the fire they paid for them. We think their interest in them was such as entitled them to recover for their wrongful destruction or damage.

The court admitted evidence of the rental value of the buildings, and instructed the jury to allow it for the time required to replace them or obtain others for their business, which is urged as error.

We deem it unnecessary to pass upon the propriety of these rulings, because we find in the record no sufficient warrant for a presumption that the jury considered this item in their assessment. If there was any basis in the evidence for the allowance of any definite sum on that account it was comparatively trifling, and the whole amount found was very considerably less than the proof would have justified under the unquestioned rule for the measurement of the damages. The error, if such it was, did no harm. In our opinion the judgment was right and will therefore be affirmed.